# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-1850

_____

Stevon Anzaldua

*Plaintiff - Appellant*

v.

Northeast Ambulance and Fire Protection District; Derek Mays, in his individual capacity

*Defendants - Appellees*

Clarence Young, in his official capacity as the Northeast Ambulance and Fire Protection District Board Member; Bridget Quinlisk-Dailey, in her official capacity as the Northeast Ambulance and Fire Protection District Board Member

*Defendants*

Robert Lee, in his individual capacity; Quentin Randolph, in his individual and offical capacity as the Northeast Ambulance and Fire Protection District Fire Chief; Kenneth Farwell, in his individual and official capacity as the Northeast Ambulance and Fire Protection District Battalion Cheif

*Defendants - Appellees*

Kate Welge, in her individual capacity

*Defendant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: March 12, 2015
Filed: July 10, 2015

_____

Before MURPHY and SHEPHERD, Circuit Judges, and HARPOOL,[1] District Judge.

_____

SHEPHERD, Circuit Judge.

Stevon Anzaldua worked for the Northeast Ambulance and Fire Protection District ("Fire District") as a full-time paramedic and firefighter. After the Fire District suspended Anzaldua for purportedly failing to respond to a directive issued by Chief Kenneth Farwell, Anzaldua emailed a newspaper reporter expressing concerns about the Fire District and about Chief Farwell in particular. The email "shocked" and "angered" many of Anzaldua's co-workers. Two battalion chiefs noted it "fostered division between Anzaldua and his co-workers, and between the District firefighters and [Chief] Farwell." As a result, the Fire District terminated Anzaldua.

Anzaldua brought this action in federal district court, alleging that the Fire District and the individuals involved in his termination violated his First Amendment right to free speech by retaliating against him for emailing the reporter and that Chief Farwell and Anzaldua's ex-girlfriend violated federal and state computer privacy laws by accessing his email account and obtaining his emails. The defendants moved to dismiss Anzaldua's complaint under Federal Rule of Civil Procedure 12(b)(6). The district court denied the motion in part and granted the motion in part, allowing some of Anzaldua's First Amendment claims to proceed but dismissing all his other claims

_____

[1]The Honorable M. Douglas Harpool, United States District Judge for the Western District of Missouri, sitting by designation.

with prejudice.  The district court subsequently denied Anzaldua leave to amend his computer privacy law claims.  The remaining defendants then moved for summary judgment on the basis of qualified immunity.  Anzaldua moved to defer ruling on summary judgment or to grant additional time to conduct discovery.  The district court denied the motion to defer and then granted summary judgment to the defendants on Anzaldua's First Amendment claims.  Anzaldua now appeals.

After careful review, we affirm the district court's grant of summary judgment to the defendants on Anzaldua's First Amendment claims.  We also affirm the denial of leave to amend Anzaldua's federal computer privacy law claims.  We reverse the district court's denial of leave to amend Anzaldua's state computer privacy law claims.

## I.  Background

Anzaldua began working for the Fire District as a part-time paramedic in 2008. In April 2011, he accepted a position as a full-time paramedic and firefighter. Following standard practice established in its collective bargaining agreement with the firefighters union ("Fire District CBA"), the Fire District subjected Anzaldua to a one-year probationary period.  In April 2012, before the probationary period expired, Chief Farwell issued Anzaldua a written reprimand for neglect of equipment and neglect of property after the Fire District found a hole in the interior wall of an ambulance Anzaldua had worked in.  Anzaldua signed the reprimand but denied responsibility for the hole and stated he disagreed with the disciplinary action.  In conjunction with the reprimand, the Fire District extended Anzaldua's probationary period six months for "professional misconduct and general behavior."  J.A. 243.  It also warned him that "[a]ny further reprimands, verbal or written, or any conduct of disciplinary action will subject you to immediate termination."  J.A. 243.  The Fire District CBA permitted the Fire District to terminate probationary employees with or without cause.

-3-

On July 21, 2012, a Fire District lieutenant wrote Chief Farwell a memorandum stating that Anzaldua and his partner had responded to a call but that their report for the call was inexplicably missing from the Fire District's reporting system. The lieutenant copied Anzaldua on the memorandum. The Fire District suspended Anzaldua's partner, who was responsible for filing the report, but did not discipline Anzaldua.

On July 24, 2012, Anzaldua drafted an email on his personal Gmail account to Dr. David Tan, a university professor who provided medical oversight for the Fire District but was not employed by the Fire District or within its chain of command. The email stated, in pertinent part, "I am making you aware that there are some major issues with the EMS side of operations. In starting, not everyone in this department is operating under the same rules." J.A. 246. Anzaldua claims he saved the email as a draft but never sent it.

Nevertheless, the email was sent from Anzaldua's Gmail account to Dr. Tan on July 24, 2012. A week later, on July 31, 2012, a copy of the Dr. Tan email was forwarded from Anzaldua's Gmail account to Chief Farwell. After learning of the email, Fire Chief Quinten Randolph directed Chief Farwell to investigate Anzaldua's concerns. On July 31, 2012, Chief Farwell sent an email to Anzaldua's Gmail account stating he was "concerned and obligated to inquire and investigate your concerns," and ordering Anzaldua to "provide for me in writing the Where, When, How, What, and Who of your concerns by the end of the day on Aug 2, 2012." J.A. 245. Anzaldua did not provide Chief Farwell the requested information. Anzaldua maintains this is because he never received Chief Farwell's email.

On August 7, 2012, the Fire District Board of Directors ordered Anzaldua to appear at a disciplinary hearing on August 13, 2012. The Board explained:

On July 24, 2012, you forwarded an email to Dr. David K. Tan suggesting that "major issues" existed within the District's EMS Division. You went on to suggest that the District was engaging in "rule" bending for certain employees. Dr. Tan is not within your department chain of command and he does not handle interdepartmental grievances. Your public statements therefore appear to be divisive, inflammatory, and without merit. When provided an opportunity by [Chief Farwell] to elaborate on your statements, you failed to do so within the time allotted. Such failure strengthened the belief that your statements were intentionally perverse and improperly motivated. Such behavior, if deemed true, is a direct violation of the District's code of conduct. The Board is hereby providing you an opportunity to be heard on this matter before deciding whether disciplinary action is warranted.

J.A. 249-50. Though the Fire District CBA did not provide probationary employees a right to union representation at disciplinary hearings, the Board advised Anzaldua he would be allowed union representation if he desired, and Anzaldua accepted the assistance of EMS Lieutenant and Shop Steward Jennifer Barbarotto.

At the disciplinary hearing, Anzaldua explained to the Board that he did not respond to Chief Farwell's directive because he never received Chief Farwell's email. He told the Board that command staff typically issued directives through the Fire District's separate email system. He also explained the concerns he expressed in the Dr. Tan email. However, the Board told Anzaldua the disciplinary hearing would focus on his failure to respond to Chief Farwell's directive, and not on his underlying concerns. On August 20, 2012, the Board found Anzaldua "failed to respond to a directive issued by a chief officer," a failure it deemed "unacceptable," and unanimously voted to suspend Anzaldua for 10 days for conduct unbecoming of a Fire District employee. J.A. 253. The union agreed with the suspension. The Fire District also warned Anzaldua "that any future misconduct, without regard to the severity, will result in your immediate termination." J.A. 254.

On August 23, 2012, Anzaldua sent an email to Elizabethe Holland, a reporter for the St. Louis Post-Dispatch. The email stated:

You have covered the Northeast Ambulance and Fire protection district before on a variety of issues. I am currently employed there as a Full-Time Firefighter/Paramedic. I am coming to you hoping to remain anonymous. There are several issues that are new. Some pertain to pension issues. Others pertain to public safety. I have tried to reach out to the directors only to be disciplined for 10 days for an email sent to the medical director with critical concerns regarding the service we provide citizens as it pertains to medical emergencies. Any time a stand is taken on this issue it leads to something punitive in the form of suspension or termination. I have been employed there for almost 4 years now we have new problems.

We have been shutting down Pumpers (Fire Apparatus) due to staffing mishaps (Resulting from the CMO). We have SCBA's (Self-contained Breathing Apparatus) that are not compliant with NFPA (National Fire Protection Association) 1971. This is a guideline to safe practices, policies and equipment. We are told on the floor (The workers actually responding to the calls) that we do not have the money. We have 6-7 WORKING SCBA's right now in the department. This is after 2 new Chevy Suburbans were purchased for command staff. The vehicles totaled somewhere around 100000.00 after the addition of things like Light-Bars and Sirens were added. One of these Command vehicles is Administrative (Chiefs Vehicle). The other vehicle is used on shift and DOES respond to calls and assumes command. This is a "Working" vehicle. There was nothing wrong with the Chief's vehicle prior to this. In fact, That old Chief's is now the "Triage" vehicle equipped with ALS (Advanced Life Support) equipment which is staffed by the Chief Medical Officer running at 4707 (Call sign). This vehicle is "suppose" to respond to calls during the CMO's duty hours. If you call North Central dispatch (314-428-1133) you can actually get the numbers of 4707 (Command Vehicle) responses. This point is simple. The safety of the men is secondary to command vehicles. We are already understaffed and short on working SCBA's which are not NFPA

-6-

Sec. 1971 compliant which means the district assumes legal liability if any Death/Disability occurs as a result of a structure fire/Fire. This is a safety issue to ALL of my Peers on the floor. These Vehicles somehow managed to be a priority over our safety.

I would like to address the issue of the Chief Medical Officer and his vehicle. The vehicle leaves the district (Normandy) everyday with him to go home (O'Fallon 30 miles away). This vehicle does NOT respond to calls when he is gone. The numbers will show that. This Vehicle has actually been parked outside of his bar. I have multiple photo's time-stamped and dated of the vehicle parked behind his bar (Da Elite Bar/Grill). This District vehicle was being used for personal business conducted at a bar with Tax-Payer gas. IT has since been parked in the back of the firehouse. The CMO (Chief Medical Officer) deals with the EMS (Emergency Medical Services) or Ambulance side of operations. He has been sending out text discussing his bar specials via district telephone. As of August 22nd, The DEA has pulled our controlled substances because the CMO Failed to renew the license for these substances. Now we have a PUBLIC safety issue. This affects the people we serve as well as the Paramedics ability stabilize medical emergencies such as seizures. No pain meds for Chest pain or fractures prior to immobilization of the injury.

So you may ask why I come to you with this. I was recently suspended for 10 days as a result of an email I was going to send Medical Director (This is a Doctor) discussing supply issues. The CMO was made aware of this email and put me in front of the board charged with conduct unbecoming. He also charged me with breaking the chain of command. I am currently serving my suspension. They (CMO and a Bat. Chief) have extended my probation and written me up and tried to fire me 3 times. They can do this because I am still currently on probation and not entitled to union legal counsel or representation even though I am a member. I have been a Paramedic going on 13 years. I have been in the field for 15 years total. They have circumvented my shift supervisor and gone directly to disciplinary action. My Shift supervisors have saved my job. I love my job and Co-workers. I figure if I get terminated and these problems get fixed to provide a better safer

-7-

service to the people and the firefighter/paramedics…then it was worth it.  I would prefer for this to stay confidential.  There is more to this if you have any additional questions please reply if you see this as something you could help change[.]

J.A. 255-56.

After Anzaldua sent the email to Holland, a copy of the email was forwarded from Anzaldua's Gmail account to Chief Farwell.  The email was subsequently passed around the Fire District, although the record does not make clear by whom. Several Fire District employees reported their negative reactions to the Holland email. Lieutenant Barbarotto "was shocked both by the content of the email, which contained numerous false statements, and that [Anzaldua] would send such an email." J.A. 259.  She stated "Anzaldua's decision to send such an email angered many of his co-workers, as we were concerned that it would make us a public laughing stock.  We knew he had written it for personal reasons and considered it to be a slap in the face to the rest of us, and were troubled that he would put his own personal agenda above the other firefighters in the District."  J.A. 259.  Daniel Newberry, a battalion chief, explained "[t]he email shocked and irritated many firefighters in the District (several of whom expressed this sentiment in my presence) and fostered division between Anzaldua and his co-workers, and between the District firefighters and [Chief] Farwell."  J.A. 262.  Philip Boling, another battalion chief, observed an identical reaction to the Holland email.  J.A. 266.

On September 13, 2012, the Board ordered Anzaldua to appear at a disciplinary hearing scheduled for September 24, 2012.  It explained:

On August 23, 2012, it is believed that you circulated a personal email publicly defaming and denigrating the District.  More significant is the fact that it contained false and misleading statements.  Such statements appeared to be intentionally divisive, inflammatory, and without just

-8-

cause. It is believed that such statements were also purposefully perverse and improperly motivated. Such behavior, if deemed true, is a direct violation of the District's code of conduct.

Notice of Hearing, R. Doc. 34-25.

On September 24, 2012, the Board voted to terminate Anzaldua. Board Members Robert Lee and Derek Mays voted for the termination, while Board Member Bridget Quinlisk-Dailey voted against. The Board sent Anzaldua a termination letter, which explained the basis for its decision:

> The Board accepted your admission and there from concluded that you circulated an email publicly defaming and denigrating the District without just cause. It was also determined that your statements were seditiously false and misleading as well as ill-intended, divisive, and retaliatory for prior discipline issued by the Board in good faith. Even though you admitted conveying such statements to, at least, one public entity; the number of other people and entities that you actually conveyed them to is unknown. The Board found your explanation for publicly expressing and circulating false and misleading information to others as not credible.

Letter of Termination, R. Doc. 34-26. Both Lee and Mays believed "Anzaldua's email to Elizabeth[e] Holland caused disruption within his department" and "had the potential to cause further disruption if Anzaldua remained employed with the District." J.A. 220. In voting to terminate Anzaldua, they considered, among other things, "the need for efficiency and loyalty within the workforce and the divisive nature of Anzaldua's email to Holland." J.A. 216, 220.

The record contains declarations and documents bearing on the concerns Anzaldua expressed in the Holland email. The Fire District had implemented minimum staffing procedures at least by December 2011 because of strained financial

resources. Mays stated that the use of "minimum manning" did not cause problems for the Fire District's provision of services. In 2012, the Fire District received far more ambulance calls than fire calls and decided to use only one pumper because it could not afford to run two pumpers and two ambulances.

Even before Anzaldua wrote to Holland, the Fire District had been interested in purchasing new SCBAs. It tested different types of SCBAs in summer 2012 to determine which type the firefighters preferred. Anzaldua participated in this testing, which the Fire District completed before Anzaldua sent the Holland email. The Board approved the purchase of new SCBAs in September 2012.

The Fire District purchased two new sport utility vehicles in 2012 because its prior vehicles had difficulty driving through water at fire scenes. The Board discussed the purchase at a public meeting in May 2012. The Fire District's vehicle use policy permitted Chief Farwell to use his vehicle for reasonable personal travel within 60 miles of the Fire District.[2] While the policy prohibited Chief Farwell from using the vehicle "while engaged in any commercial endeavor," it permitted him to use the vehicle to drive to and from his place of work, so long as his place of work was within 60 miles of the Fire District. R. Doc. 34-23, at 2. The record contains no evidence suggesting Chief Farwell's restaurant was more than 60 miles away. The vehicle use policy enabled Chief Farwell to access his vehicle while away from the firehouse in case he needed to respond to a call. In 2012, Chief Farwell issued directions and commands to firefighters responding to fires. The record contains no evidence of a policy prohibiting Chief Farwell from using his phone to text specials to co-workers.

---

[2] Anzaldua had access to all of the Fire District's policies and procedures during his employment.

On August 30, 2012, Fire Chief Randolph and Chief Farwell attended a public meeting in Jefferson City, Missouri, regarding the Fire District's expired narcotics license. Holland published an article on August 31, 2012, which reported on the Jefferson City meeting.

Anzaldua filed this lawsuit in July 2013, naming as defendants the Fire District; Lee and Mays, in their individual and official capacities; Board Members Clarence Young and Quinlisk-Dailey, in their official capacities; Fire Chief Randolph and Chief Farwell, in their individual and official capacities; and Kate Welge, Anzaldua's ex-girlfriend, in her individual capacity. Anzaldua's complaint contained four counts. Count 1, which Anzaldua brought under 42 U.S.C. § 1983, alleged Lee, Mays, Quinlisk-Dailey, Fire Chief Randolph, and Chief Farwell terminated Anzaldua in violation of his First Amendment right to free speech. Count 2, also brought under section 1983, alleged *all* the defendants conspired to terminate Anzaldua in violation of his First Amendment right to free speech. Count 3 alleged Chief Farwell and Welge accessed Anzaldua's Gmail account and obtained the Dr. Tan and Holland emails in violation of the Stored Wire and Electronic Communications and Transactional Records Access Act ("SCA"), 18 U.S.C. § 2701. Count 4 alleged this access violated the Missouri Computer Tampering Act ("MCTA"), Mo. Rev. Stat. § 569.095.

The defendants moved to dismiss Anzaldua's complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion in part and denied the motion in part, dismissing with prejudice all of Anzaldua's claims except his Count 1 claims against Lee, Mays, and Chief Farwell in their individual capacities. Anzaldua moved for reconsideration of the motion-to-dismiss ruling or for leave to amend his complaint. The district court held that motion in abeyance to allow Anzaldua to submit a proposed first amended complaint, which he subsequently did. The proposed first amended complaint contained the same four counts as the original complaint, but against the following defendants: Count 1 against the Fire District and

-11-

Lee, Mays, Fire Chief Randolph, and Chief Farwell, in their individual capacities; Count 2 against Lee, Mays, Fire Chief Randolph, and Chief Farwell, in their individual capacities; and Counts 3 and 4 against Chief Farwell and Welge, in their individual capacities.

While the district court considered Anzaldua's proposed first amended complaint, Lee, Mays, and Chief Farwell (later joined by Fire Chief Randolph) moved for summary judgment on the basis of qualified immunity. In response, Anzaldua filed a Rule 56(d) motion requesting that the district court defer ruling on the summary judgment motion or grant additional time to conduct discovery before doing so. The district court denied the Rule 56(d) motion. It then granted Anzaldua leave to amend his claims under Counts 1 and 2 and denied him leave to amend his claims under Counts 3 and 4. Anzaldua filed his first amended complaint on February 13, 2014, alleging only the First Amendment claims in Counts 1 and 2. The district court subsequently granted the defendants' summary judgment motion and dismissed the first amended complaint in its entirety, finding the defendants were entitled to qualified immunity under the Pickering balancing test. See Pickering v. Bd. of Educ., 391 U.S. 563 (1968).

On appeal, Anzaldua challenges the district court's (1) grant of summary judgment to the defendants on the basis of qualified immunity, (2) denial of his Rule 56(d) motion to defer ruling on the summary judgment motion, (3) dismissal of the Fire District, which never joined the summary judgment motion, (4) denial of leave to amend the SCA claims, and (5) denial of leave to amend the MCTA claims.

## II. Counts 1 and 2: First Amendment Claims

### A. Qualified Immunity

We first address Anzaldua's argument that the district court erred in finding the defendants were entitled to qualified immunity. "We review the grant of summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences in the light most favorable to [Anzaldua], the nonmoving party." McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 860 (8th Cir. 2009). We will affirm "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The two prongs of our qualified immunity analysis require us to answer (1) whether the facts alleged demonstrate a violation of the employee's constitutional right and (2) whether that right was clearly established at the time of the employee's firing. Hemminghaus v. Missouri, 756 F.3d 1100, 1110 (8th Cir. 2014) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1865-66 (2014)). This case can be resolved solely under the first prong. "The inquiry into the protected status of speech is one of law, not fact." Connick v. Myers, 461 U.S. 138, 148 n.7 (1983).

We use the first prong to determine whether a First Amendment violation occurred. See Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) ("[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."). The heart of this determination is the Pickering balancing test, under which we balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.

-13-

Before we reach the Pickering balancing test, though, we make two preliminary inquiries to ensure that the employee and the employer each has an interest to balance. The first inquiry is to determine "whether the employee spoke as a citizen on a matter of public concern." Garcetti, 547 U.S. at 418. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises." Id. (citation omitted).

"[I]f the possibility of a First Amendment claim has arisen," then our second inquiry is to "'ask whether [the employer] has produced evidence to indicate the speech had an adverse impact on the efficiency of the [employer's] operations.'" Hemminghaus, 756 F.3d at 1111 (alterations in original) (quoting Lindsey v. City of Orrick, Mo., 491 F.3d 892, 900 (8th Cir. 2007)). If the employer shows a sufficient adverse impact, then we proceed to the Pickering balancing test. If it does not, then the qualified immunity defense must fail. Sexton v. Martin, 210 F.3d 905, 913 (8th Cir. 2000).

## 1. Matter of Public Concern

Anzaldua argues his Holland email was a matter of public concern because it implicated the misuse of public monies and both firefighter and public safety. The defendants respond that Anzaldua simply aired personal employment grievances.

"To determine whether speech qualifies as a matter of public concern, we must examine the content, form and context of the speech, as revealed by the whole record." Sparr v. Ward, 306 F.3d 589, 594 (8th Cir. 2002). "'When speech relates both to an employee's private interests as well as matters of public concern, the speech is protected if it is primarily motivated by public concern.'" McCullough, 559 F.3d at 866 (quoting Altonen v. City of Minneapolis, 487 F.3d 554, 559 (8th Cir. 2007)). "If the main motivation for the speech was furthering [the employee's]

-14-

'private interests rather than to raise issues of public concern, her speech is not protected, even if the public would have an interest in the topic of her speech.'" Altonen, 487 F.3d at 559 (quoting Bailey v. Dep't of Elementary and Secondary Educ., 451 F.3d 514, 518 (8th Cir. 2006)).

Here, we are skeptical that Anzaldua's email was primarily motivated by public concern, especially considering that he sent the email just days after being suspended and that the email singled out Chief Farwell, with whom Anzaldua had, in the words of the district court, "an already strained relationship." However, we need not decide whether Anzaldua's email was primarily motivated by public concern because we believe Anzaldua's claims fail under the Pickering balancing test. See Waters v. Churchill, 511 U.S. 661, 680 (1994) (plurality opinion) (declining to decide whether employee's speech was on a matter of public concern where the "potential disruptiveness of the speech . . . was enough to outweigh whatever First Amendment value it might have had"). Thus we proceed to the next step in our inquiry.

## 2. Adverse Effect on Fire District Operations

Anzaldua argues the defendants can satisfy this step only if they present specific evidence of actual disruption. However, "'[e]vidence of actual disruption . . . is not required in all cases.'" Bailey, 451 F.3d at 521 (alterations in original) (quoting Shands v. City of Kennett, 993 F.2d 1337, 1344 (8th Cir. 1993)); see also Tindle v. Caudell, 56 F.3d 966, 972 (8th Cir. 1995) ("A showing of actual disruption is not always required in the balancing process under Pickering."). This is because "'we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" Hemminghaus, 756 F.3d at 1112 (quoting Connick, 461 U.S. at 152). Thus "'[w]e have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large.'" Id. (quoting

-15-

Waters, 511 U.S. at 673 (plurality opinion) ("Few of the examples we have discussed involve tangible, present interference with the agency's operation. The danger in them is mostly speculative.")). And "'we have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern.'" Id. (quoting Waters, 511 U.S. at 673 (plurality opinion)).[3]

Further, a fire department, as a public safety organization, "has a more significant interest than the typical government employer in regulating the speech activities of its employees in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence' in its ability." Shands, 993 F.3d at 1344 (quoting Hughes v. Whitmer, 714 F.2d 1407, 1419 (8th Cir. 1983)). "'When lives may be at stake in a fire, an *espirit de corps* is essential to the success of the joint endeavor.'" Id. at 1344-45 (quoting Janusaitis v.

_____

[3]We recognize some Eighth Circuit cases seem to support Anzaldua's argument that employers must always present specific evidence of actual disruption. See, e.g., Belk v. City of Eldon, 228 F.3d 872, 882 (8th Cir. 2000) ("Where, as here, the employer has failed to demonstrate any disruption, there is no balancing to be done and the evidentiary failure is fatal to the claim of qualified immunity."). To the extent these cases represent a split among panels in our circuit, we note that Anzaldua fails to cite, and we have failed to locate, any case supporting his argument that predates Germann v. City of Kan. City, 776 F.2d 761, 765 (8th Cir. 1985) ("It is not necessary 'for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" (quoting Connick, 461 U.S. at 152 )); see Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) ("[W]hen faced with conflicting panel opinions, the earliest opinion must be followed as it should have controlled the subsequent panels that created the conflict." (internal quotation marks omitted)). Moreover, we recently observed that Supreme Court precedent places in question the soundness of the cases that suggest employers must present specific evidence of actual disruption. See Hemminghaus, 756 F.3d at 1112 n.10 (citing Waters, 511 U.S. at 673; and Connick, 461 U.S. at 152).

Middlebury Volunteer Fire Dep't, 607 F.2d 17, 26 (2d Cir. 1979)). Thus we give "considerable judicial deference" to the defendants' determination that Anzaldua's "speech had caused or would cause dissension and disruption." Id. at 1345.

Moreover, although we do not require actual evidence of disruption in all cases, it exists here. Three firefighters submitted declarations showing the disruption Anzaldua's email caused. Lieutenant Barbarotto explained she was "shocked both by the contents of the email . . . and that [Anzaldua] would send" it. She stated the email "angered" many firefighters, who worried it would "make [them] a public laughing stock." Two battalion chiefs similarly reported the email "shocked and irritated many firefighters in the District" and "fostered division between Anzaldua and his co-workers, and between the District firefighters and [Chief] Farwell." Anzaldua's email also attacked Chief Farwell personally, accusing him of shutting down pumpers, prioritizing his business over his firefighters' safety, and violating the Fire District's vehicle use and cell phone policies. See Bailey, 451 F.3d at 521 ("The letter accused Bailey's superiors of fraud and legal and ethical violations. Such accusations are sufficient evidence of potential workplace disruption."). Thus this is not a case where the Fire District had no supporting evidence of disruption or relied on its own "[m]ere allegations of disruption." Sexton, 210 F.3d at 912; see also Connick, 461 U.S. at 151-52 (giving deference to supervisor's determination of disruption because "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate"). Viewed in light of the considerable deference we owe the Fire District's determination of actual or potential disruption, we find the defendants satisfy this step.

### 3. Pickering Balancing Test

We consider six interrelated factors when balancing Anzaldua's interest in speech against the Fire District's interest in promoting the efficient operation of the

-17-

fire department: (1) the need for harmony in the work place; (2) whether the government's responsibilities require a close working relationship; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties. Hemminghaus, 756 F.3d at 1113-14. "[T]he Pickering balance is flexible and the weight to be given to any factor varies depending on the circumstances of the case." Germann v. City of Kan. City, 776 F.2d 761, 764 (8th Cir. 1985).

Applying these factors, we agree with the district court that "the balance weighs in favor of [the] defendants." R. Doc. 63, at 18. Of critical importance is the principle, discussed above, that we show substantial deference both to the Fire District's determination that Anzaldua's email "had caused or would cause dissension and disruption," and to its "response to the actual or perceived disruption." Shands, 993 F.2d at 1345. As noted, "'[w]hen lives may be at stake in a fire, an *espirit de corps* is essential to the success of the joint endeavor.'" Id. at 1344-45 (quoting Janusaitis, 607 F.2d at 26). The Fire District also worked with other nearby fire departments and needed those firefighters to trust Chief Farwell. Thus we find the district court correctly concluded "Mays and Lee reasonably believed [Anzaldua's] speech was an attempt to undermine Farwell's authority and had led, or would lead, to disruption in the department." R. Doc. 63, at 18.

Moreover, it is clear Anzaldua emailed Holland just days after being placed on what he claims was an unjustified suspension and that Anzaldua's relationship with Chief Farwell had been contentious for months. See Connick, 461 U.S. at 153 ("When employee speech . . . arises from an employment dispute[,] . . . additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office."). Although there is no suggestion Anzaldua emailed Holland during work hours or from the fire station, see id. (finding employee's preparing and distributing questionnaire at office supported employer's

-18-

conclusion that speech would endanger office functioning), Anzaldua did go outside the chain of command when he secretly emailed a reporter. Fire District employees reacted negatively to this exposure.

Further, the degree of public interest in Anzaldua's statements was minimal. The Fire District instituted minimum manning procedures due to budget constraints and decided to run one pumper so it could operate two ambulances. There is no evidence this choice affected the Fire District's provision of services. The Fire District was in the process of testing and purchasing new SCBAs. And neither of these issues was "at the center of public debate." Shands, 993 F.2d at 1346. The purchase of new vehicles had been discussed at a public Board meeting, and the expired narcotics licenses similarly had been discussed a public meeting in Jefferson City. The public had even less interest in Anzaldua's attack on Chief Farwell for making permitted use of his work vehicle and in his complaint about not being allowed union representation, which, while literally true, was misleading because he had been offered and in fact accepted the help of a union representative. Although there is no suggestion Anzaldua's email impeded his ability to perform his duties as a paramedic and firefighter, this factor does not outweigh the others. See id. (stating that "this factor is not determinative" and finding Pickering factors favored employer even though there was no evidence employees' job performance had been hindered).

In sum, we find the Pickering factors favor the defendants and thus agree with the district court that the defendants are entitled to qualified immunity because they did not violate Anzaldua's First Amendment right to free speech.

## B. Rule 56(d) Motion

We next address Anzaldua's argument that the district court erred in denying his Rule 56(d) motion. Anzaldua argues the defendants' qualified immunity argument depended on their assertion that he made false statements in the Holland

-19-

email and thus that it was essential for him to show those statements were true. He argues he was unable to prove his statements' veracity because the case management order prevented him from conducting discovery before responding to the summary judgment motion. He suggests that if he had been allowed to depose the defendants' witnesses and discover documents in the defendants' possession—he requested the district court allow him an additional 4 to 5 months of discovery and 21 days on top of that to respond to the summary judgment motion—then he could have proven his statements' truth.

We review the denial of a Rule 56(d) motion for an abuse of discretion. Toben v. Bridgestone Retail Operations, LLC, 751 F.3d 888, 894 (8th Cir. 2014). Under Rule 56(d), a court may defer considering a summary judgment motion or allow time for discovery "[i]f a nonmovant shows by affidavit or declaration that, for specific reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). However, Rule 56 "does not require trial courts to allow parties to conduct discovery before entering summary judgment." United States ex rel. Small Bus. Admin. v. Light, 766 F.2d 394, 397 (8th Cir. 1985) (per curiam). Thus district courts possess "wide discretion in denying" Rule 56(d) motions. Toben, 751 F.3d at 895. "[A] district court's [Rule 56(d)] discretion is further restricted when a summary judgment motion based on qualified immunity is at issue." Jones v. City & Cnty. of Denver, Colo., 854 F.2d 1206, 1211 (10th Cir. 1988) (citing Martin v. Malhoyt, 830 F.2d 237, 256-57 (D.C. Cir. 1987)). This restriction reflects the concern "that insubstantial claims against government officials be resolved prior to discovery and on summary judgment if possible." Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987) (internal quotation marks omitted); see also Janis v. Biesheuvel, 428 F.3d 795, 800 (8th Cir. 2005) ("Qualified immunity is an immunity from suit, not simply from liability.").

It is not enough for a party to "set forth some facts she 'hope[s] to elicit from further discovery.'" Toben, 751 F.3d at 895 (alteration in original) (quoting Cal. ex

-20-

rel. Cal. Dep't of Toxic Subs. Control v. Campbell, 138 F.3d 772, 779 (9th Cir. 1998)).  And "the mere assertion that evidence supporting a party's allegation is in the opposing party's hands is insufficient to justify a denial of a summary judgment motion on [Rule 56(d)] grounds." Jones, 854 F.2d at 1211.  Instead, the party must "show[] 'that the facts sought exist.'" Toben, 751 F.3d at 895 (quoting Campbell, 138 F.3d at 779); see also Janis, 428 F.3d at 800 ("'A party invoking [Rule 56(d)'s] protections must do so in good faith by affirmatively demonstrating why he cannot respond to a movant's affidavits as otherwise required . . . and how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" (quoting William Poultry Co. v. Morton-Norwich Prods., Inc., 520 F.2d 289, 297 (8th Cir. 1975))).

Here, we find unavailing Anzaldua's argument that he needed additional discovery to respond to the documents and declarations the defendants submitted in support of their summary judgment motion.  First, we note that Anzaldua failed to show why it was essential for the court to determine whether each of his statements was true or not.  Second, we note that while the case management order did not require initial disclosures be completed until after resolution of the summary judgment motion, neither did it prohibit Anzaldua from conducting discovery.  Third, even assuming the truth or falsity of Anzaldua's statements was essential to his defense, Anzaldua fails to show he would benefit from further discovery because he cannot show facts exist that would prove the veracity of his statements in the Holland email.  That is to say, he cannot state with specificity what evidence further discovery would uncover.  His Rule 56(d) affidavit simply asserted that if he could depose witnesses and discover documents, then he could prove his statements were true and thus that the defendants violated his First Amendment rights.  Such an unspecific assertion is insufficient under Rule 56(d). See Duffy v. Wolle, 123 F.3d 1026, 1041 (8th Cir. 1997) ("'Rule 56([d]) does not condone a fishing expedition' where a plaintiff merely hopes to uncover some possible evidence of a constitutional violation." (quoting Gardner v. Howard, 109 F.3d 427, 431 (8th Cir. 1997))),

-21-

abrogated on other grounds by <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031 (8th Cir. 2011) (en banc). We find the district court did not abuse its wide discretion in denying Anzaldua's Rule 56(d) motion.

## C. Dismissal of Non-Moving Fire District

Because the individual defendants were entitled to qualified immunity, the district court properly granted summary judgment to the Fire District although it failed to join the summary judgment motion. Once the district court determined no First Amendment violation had occurred, it was proper for the district court to enter summary judgment for all defendants facing identical First Amendment claims. <u>See Madewell v. Downs</u>, 68 F.3d 1030, 1050 (8th Cir. 1995).

## III. Counts 3 and 4: SCA and MCTA Claims

## A. SCA Claims

We next address Anzaldua's argument that it was error for the district court to deny him leave to amend his SCA claims. Anzaldua alleged in his proposed first amended complaint that Chief Farwell and Welge, acting together or alone, accessed his Gmail account through Gmail's server and: (1) obtained the email Anzaldua had prepared but not sent to Dr. Tan, which at the time was stored on Gmail's server as a draft message, and sent the email to Dr. Tan; and (2) obtained the email Anzaldua had sent to Holland, which at the time was stored on Gmail's server as a sent message, and forwarded the email to Chief Farwell. Anzaldua further alleged Chief Farwell and Welge deleted the Dr. Tan and Holland emails after they sent them. Anzaldua alleged he believed Chief Farwell and Welge accessed his Gmail account because he traced access of the account to an IP address at or near Chief Farwell's restaurant, where Welge worked. Anzaldua further explained how Chief Farwell and Welge allegedly accessed his account:

> While Defendant Welge and Anzaldua were in a romantic relationship, on one occasion prior to the termination of that relationship, Anzaldua gave Defendant Welge his Gmail password so that she could email his resume on his behalf to prospective employers. Anzaldua did not give Defendant Welge general permission to access his personal Gmail account and did not realize she had continued to access his personal Gmail account until he investigated how his personal emails were being provided to the Fire District. [Anzaldua] and Defendant Welge's romantic relationship ended in July of 2011 and Anzaldua did not know, nor did he authorize Defendant Welge to access his personal Gmail account at any time before or after that relationship ended, except to send the resumes on his behalf as set forth above.

First Amended Complaint, R. Doc. 29-1, at ¶ 50.

Finding Anzaldua's proposed first amended complaint failed to state an SCA claim, the district court denied leave to amend on the ground that amendment would be futile. See United States ex rel. Roop v. Hypoguard USA, Inc., 559 F.3d 818, 822 (8th Cir. 2009) ("Futility is a valid basis for denying leave to amend."). The district court reasoned that "the alleged improper use of [Anzaldua's] information was not a SCA violation, because [Anzaldua] gave Welge access to his Gmail account." R. Doc. 49, at 19.

On appeal, Anzaldua argues he sufficiently alleged unauthorized access of his Gmail account. Although we agree with Anzaldua that his proposed first amended complaint sufficiently alleged unauthorized access, see Roop, 559 F.3d at 822 (stating that we review the district court's futility determination de novo and its denial of leave to amend for abuse of discretion), we affirm the district court on the alternative ground that amendment would be futile because neither of Anzaldua's emails was in "electronic storage" within the meaning of the SCA. See Interstate Bakeries Corp. v. OneBeacon Ins. Co., 686 F.3d 539, 542 (8th Cir. 2012) ("'We may affirm the judgment of the district court on any basis disclosed in the record, whether or not the

district court agreed with or even addressed that ground.'" (internal quotation marks omitted) (quoting Warner Bros. Entm't, Inc. v. X One X Prods., 644 F.3d 584, 591 (8th Cir. 2011))).

The SCA provides a civil cause of action against anyone who "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage." 18 U.S.C. § 2701; id. § 2707 (providing for civil cause of action). Contrary to the district court, we believe Anzaldua's proposed first amended complaint sufficiently alleged that Chief Farwell's and Welge's access was without authorization or exceeded authorization. Taking Anzaldua's allegations as true, Anzaldua gave Welge his password so she could access his Gmail account one time and for the limited purpose of sending resumes on his behalf. Given these facts, we conclude Chief Farwell and Welge at least exceeded the expressly limited authorization Anzaldua gave Welge when they accessed Anzaldua's Gmail account over a year later for wholly different purposes. See Theofel v. Farey-Jones, 359 F.3d 1066, 1072 (9th Cir. 2004) (reasoning that principles of common law trespass guide scope of access under SCA); Restatement (Second) of Torts § 168 (1965) ("A conditional or restricted consent to enter land creates a privilege to do so only in so far as the condition or restriction is complied with."); cf. Johnson v. U.S. Bancorp Broad-Based Change in Control Severance Pay Program, 424 F.3d 734, 740 (8th Cir. 2005) (interpreting employment contract that forbade unauthorized access and reasoning that "the district court's determination that 'Johnson was authorized to access the files,' because 'nothing prevented her access whatsoever,' mistakenly equated *ability* to access a file with *authorization* to access the file"). This conclusion is supported by the fact that Chief Farwell and Welge deleted the Dr. Tan and Holland emails after they sent them, which suggests they knew they lacked authorization.

-24-

Even if Anzaldua sufficiently alleged unauthorized access, though, the SCA also required him to allege that the emails were in "electronic storage." This he failed to do. See William Jeremy Robison, Note, Free at What Cost?: Cloud Computing Privacy Under the Stored Communications Act, 98 Geo. L.J. 1195, 1206 (2010) ("[The 'electronic storage'] requirement is commonly misunderstood because the statutory definition of 'electronic storage' is much narrower than its name suggests."); see also Orin S. Kerr, A User's Guide to the Stored Communications Act, and A Legislator's Guide to Amending It, 72 Geo. Wash. L. Rev. 1208, 1214 (2004) ("[T]here are many problems of Internet privacy that the SCA does not address. The SCA is not a catch-all statute designed to protect the privacy of stored Internet communications; instead it is narrowly tailored to provide a set of Fourth Amendment-like protections for computer networks."). Under the statute, "electronic storage" means (1) "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof," or (2) "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).[4][5]

---

[4]We recognize authorities are divided on whether these two definitional provisions must be read together or apart. Compare Jennings v. Jennings, 736 S.E.2d 242, 247-48 (S.C. 2012) (Toal, C.J., concurring in result) (together); with Theofel, 359 F.3d at 1075-76 (apart). Although we present the provisions in the disjunctive, in part because that is how the parties argued them, we express no opinion on this issue.

[5]It is not always easy to square the decades-old SCA with the current state of email technology. One commentator has observed that the definition of "electronic storage" "is better understood in light of the e-mail delivery system in place at the time [of the SCA's enactment in the mid-1980s], which required multiple service providers to store communications briefly before forwarding them on to their next destination or while awaiting download by the recipient." Robison, Free at What Cost?, 98 Geo. L.J. at 1206. By contrast, today's predominant web-based email services, like Gmail, allow users to "access their email over the web from any computer, and [users] do not automatically download their messages to their own

Anzaldua first claims his draft email to Dr. Tan was in "temporary, intermediate storage." While this argument appeals to our everyday understanding of a "draft," it fails to meet the statutory definition. Even assuming an unsent draft email qualifies as an electronic communication, see 28 U.S.C. § 2510(12) ("'[E]lectronic communication' means any *transfer* of signs, signals, writing, images, sounds, data, or intelligence of any nature *transmitted* in whole or in part . . . .") (emphasis added), because the email had not been sent, its storage on the Gmail server was not "temporary, intermediate," and "incidental to the electronic transmission thereof." 18 U.S.C. § 2510(17)(A); see United States v. Councilman, 418 F.3d 67, 81 (1st Cir. 2005) (en banc) ("The first category . . . refers to temporary storage, such as when a message sits in an e-mail user's mailbox after transmission but before the user has retrieved the message from the mail server."); In re Doubleclick Inc. Privacy Litig., 154 F. Supp. 2d 497, 512 (S.D.N.Y. 2001) ("[The SCA] only protects electronic communications stored 'for a limited time' in the 'middle' of a transmission, i.e. when an electronic communication service temporarily stores a communication while waiting to deliver it.").

Anzaldua next claims his sent Holland email was stored "for purposes of backup protection."[6] Courts most often discuss the backup protection provision as

computers as non-web-based email service users do. Instead, if [web-based] users save a message, they generally leave it on the [web-based email] server and return to [the email service] via the web to access it on subsequent occasions." United States v. Weaver, 636 F. Supp. 2d 769, 772 (C.D. Ill. 2009) (citation omitted). Of course, web-based email users may still download emails to their computers through email client programs, which complicates the picture. See Cheng v. Romo, 2013 WL 6814691, at *4-5 (D. Mass. Dec. 20, 2013) (slip copy).

[6]Anzaldua does not argue that his draft email was stored for backup protection purposes or that his sent email was in temporary, intermediate storage, and we note he did not allege the sent email was unopened when Chief Farwell and Welge allegedly obtained it. Thus we decline to consider these arguments.

it pertains to copies of opened emails that remain on email servers. A principal case in the area—and the case Anzaldua relies on—is <u>Theofel</u>, where the Ninth Circuit held that such copies would be deemed stored for backup protection purposes until "the underlying message . . . expired in the normal course" because "[a]n obvious purpose for storing a message on an [internet service provider's ("ISP")] server after delivery [from the server to the user] is to provide a second copy of the message in the event that the user needs to download it again—if, for example, the message is accidentally erased from the user's own computer." 359 F.3d at 1075-76.

Although several courts have followed <u>Theofel</u>, <u>see, e.g.</u>, <u>Pure Power Boot Camp v. Warrior Fitness Boot Camp</u>, 587 F. Supp. 2d 548, 555 (S.D.N.Y. 2008) (citing cases); <u>Bailey v. Bailey</u>, No 07-11672, 2008 WL 324156, at *6 (E.D. Mich. Feb. 6, 2008), the decision has been subject to criticism. <u>See</u> <u>United States v. Warshak</u>, 631 F.3d 266, 291 (6th Cir. 2010) (noting criticism); Kerr, <u>A User's Guide</u>, 72 Geo. Wash. L Rev. at 1217 ("[T]he Ninth Circuit's analysis in <u>Theofel</u> is quite implausible and hard to square with the statutory text.").[7]

Some cases openly disagree with <u>Theofel</u>'s reasoning. <u>See</u> <u>Lazette v. Kulmatycki</u>, 949 F. Supp. 2d 748, 758 & n.13 (N.D. Ohio 2013) ("E-mails which an

---

[7]Kerr further explained: "An understanding of the structure of the SCA indicates that the backup provision of the definition of electronic storage exists only to ensure that the government [or the defendants, as relevant here,] cannot make an end-run around the privacy-protecting [electronic communication service ("ECS")] rules by attempting to access backup copies of unopened e-mails made by the ISP for its administrative purposes. ISPs regularly generate backup copies of their servers in the event of a server crash or other problem, and they often store these copies for the long term. Section 2510(17)(B) provides that backup copies of unopened e-mails are protected by the ECS rules even though they are not themselves incident to transmission; without this provision, copies of unopened e-mails generated by this universal ISP practice would be unprotected by the SCA." Kerr, <u>A User's Guide</u>, 72 Geo. Wash. L. Rev. at 1217 n.61 (citation omitted).

intended recipient has opened may, when not deleted, be 'stored,' in common parlance. But in light of the restriction of 'storage' in [the SCA] solely for 'backup protection,' e-mails which the intended recipient has opened, but not deleted (and thus which remain available for later re-opening) are not being kept 'for the purposes of backup protection.'"); Jennings v. Jennings, 736 S.E.2d 242, 245 (S.C. 2012) ("We decline to hold that retaining an opened email constitutes storing it for backup protection under the [SCA]. The ordinary meaning of the word 'backup' is 'one that serves as a substitute or support.' Thus, Congress's use of 'backup' necessarily presupposes the existence of another copy to which this e-mail would serve as a substitute or support. We see no reason to deviate from the plain, everyday meaning of the word 'backup,' and conclude that as the single copy of the communication, Jennings' e-mails could not have been stored for backup protection." (citation omitted) (quoting Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/backup)).

Other authorities dispute Theofel by insisting that the two definitional provisions in section 2510(17) be read together. See Jennings, 736 S.E.2d at 248 (Toal, C.J., concurring in result) ("[E]lectronic storage refers only to temporary storage, made in the course of transmission, by an [electronic service communication] provider, and to backups of such intermediate communications."); Kerr, A User's Guide, 72 Geo. Wash. L. Rev. at 1214 ("[The SCA] defines 'electronic storage' as 'any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof,' plus any backup copies of files in such temporary storage." (footnote omitted) (quoting 18 U.S.C. § 2510(17))).

Still other cases distinguish Theofel on the ground that it addressed non-web-based email technology:

[Theofel] held that once a user receives an email, any version on the ISP's server is a copy that is being stored for backup until the user's

> version expires in the normal course. [Theofel] relies on the assumption that users download emails from an ISP's server to their own computers. That is how many email systems work, but a Hotmail account is web-based and remote. Hotmail users can access their email over the web from any computer, and they do not automatically download their messages to their own computers as non-web-based email service users do. Instead, if Hotmail users save a message, they generally leave it on the Hotmail server and return to Hotmail via the web to access it on subsequent occasions. The distinction between web-based email and other email systems makes Theofel largely inapplicable here.

United States v. Weaver, 636 F. Supp. 2d 769, 772 (C.D. Ill. 2009) (internal quotation marks, citations, and footnote omitted); see also Crispin v. Christian Audigier, Inc., 717 F. Supp. 2d 965, 984-85 (C.D. Cal. 2010) (acknowledging that Weaver and Theofel are not inconsistent because Weaver "confronted a situation not previously considered by" Theofel); but see Cheng v. Romo, 2013 WL 6814691, at *5 (D. Mass. Dec. 20, 2013) (slip copy) (noting that under Weaver's reasoning a defendant's legal liability for accessing a plaintiff's emails "turn[s] on what piece of software (i.e., web browser vs. email client) [the plaintiff] happened to use to access his email account"); Jennings, 736 S.E.2d at 246-47 (Toal, C.J., concurring in result) (same). If we adopted the reasoning of any of the cases criticizing Theofel, we likely would not find that the Holland email was stored for backup protection purposes.

Ultimately, however, we need not decide whether Theofel or one of its critics is correct because even if we adopted Theofel's reasoning we still would conclude that the sent Holland email was not stored on the Gmail server for backup protection purposes. Theofel acknowledged "the mere fact that a copy could serve as a backup does not mean it is stored for that purpose." 359 F.3d at 1076. Thus its holding relied on a functional distinction that tied "the lifespan of a backup . . . to that of the underlying message." Id. And "[w]here the underlying message has expired in the normal course, any copy is no longer performing any backup function." Id.

-29-

Here, Anzaldua simply alleged that his sent email remained on Gmail's server as a matter of course. We hold that once Anzaldua successfully sent the email to Holland, as he alleged he did, the copy Gmail retained on its server as a sent message did not perform a backup function.[8] See id. ("An [email service] that kept permanent copies of temporary messages could not fairly be described as 'backing up' those messages."); see also Kerr, A User's Guide, at 1218 ("Although it is unclear what 'normal course' the Ninth Circuit has in mind, the apparent test is whether the user or employees of the service provider have reason to believe that they may need to access an additional copy of the file in the future."). If Theofel has any application here, it would be to protect a copy of the email stored with Holland's email service, not Anzaldua's. See Theofel, 359 F.3d at 1075 (stating that a backup copy would "provide a second copy of the message in the event that the user needs to download it again—if, for example, the message is accidentally erased from the user's own computer").

Accordingly, neither the draft of the Dr. Tan email nor the sent Holland email falls within the protection afforded by the SCA.[9]

## B. MCTA

Finally, we address Anzaldua's argument that it was error for the district court to deny him leave to amend his MCTA claims. In advancing these claims, Anzaldua's proposed first amended complaint relied on the same factual allegations

---

[8]Other provisions of the SCA, see 18 U.S.C. §§ 2702(a) and 2703(b), protect copies of emails held by remote computing services, which "provi[de] to the public . . . computer storage or processing services by means of an electronic communications system." Id. § 2711(2).

[9]Anzaldua argues the district court erred in dismissing his SCA claims in the original complaint. Because those claims suffer the same defect as the SCA claims in the proposed first amended complaint, there was no error.

-30-

as his SCA claims. He additionally alleged that he owned the Dr. Tan and Holland emails, that Chief Farwell and Welge took and disclosed the emails from a computer, computer system, or computer network, and that Chief Farwell and Welge received, retained, used, or disclosed the emails, which they knew or believed had been obtained in violation of the MCTA.

As it did with Anzaldua's SCA claims, the district court found amendment of Anzaldua's MCTA claims would be futile because Anzaldua failed to allege unauthorized taking, disclosure, or use of the emails, as required by the MCTA. On appeal, Anzaldua argues he sufficiently alleged such unauthorized conduct. We agree. See Kingman v. Dillard's, Inc., 643 F.3d 607, 615 (8th Cir. 2011) ("'When determining the scope of Missouri law, we are bound by the decisions of the Supreme Court of Missouri. If the Supreme Court of Missouri has not addressed an issue, we must predict how the court would rule, and we follow decisions from the intermediate state courts when they are the best evidence of Missouri law.'" (quoting Eubank v. Kan. City Power & Light Co., 626 F.3d 424, 427 (8th Cir. 2010))).

Under the MCTA, a person commits the crime of computer tampering if he "knowingly and without authorization or without reasonable grounds to believe that he has such authorization: . . . (3) Discloses or takes data . . . residing or existing internal or external to a computer, computer system, or computer network; or . . . (6) Receives, retains, uses, or discloses any data he knows or believes was obtained in violation of this subsection." Mo. Rev. Stat. § 569.095. The statute provides a civil cause of action for "the owner . . . of the . . . data." Id. § 537.525.

Few cases discuss the MCTA, and the ones that do are not relevant here. Nevertheless, for the reasons provided in our discussion of Anzaldua's SCA claims, we have no difficulty predicting that the Missouri Supreme Court would find that Anzaldua sufficiently alleged Chief Farwell and Welge acted "knowingly and without authorization or without reasonable grounds to believe that [they had] such

-31-

authorization." We further find that Anzaldua's proposed first amended complaint satisfies the other elements of the MCTA because Anzaldua alleged facts supporting that he owned the emails and that Chief Farwell and Welge took and later disclosed the emails, which they knew had been obtained without authorization.

Accordingly, we find the district court erred in denying Anzaldua leave to amend his MCTA claims.[10]

## IV. Conclusion

For the foregoing reasons, we affirm the grant of summary judgment to the defendants as to Anzaldua's First Amendment claims, the dismissal of Anzaldua's SCA claims in his original complaint, and the denial of leave to amend Anzaldua's SCA claims. We reverse the denial of leave to amend Anzaldua's MCTA claims. We remand to the district court with instructions that the district court grant Anzaldua leave to file an amended complaint asserting his MCTA claims.

———————————————————

[10]Anzaldua also argues the district court erred in dismissing the MCTA claims in his original complaint. Because we hold that the district court erred in denying leave to amend these claims, we need not address their original dismissal.